**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**PARKERSBURG DIVISION**

**GRETCHEN H. WATKINS BAILEY,**

     **Plaintiff,**

v.                              **Case No.: 6:13-cv-31743**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

     **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Claimant's application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is assigned to the Honorable Thomas E. Johnston, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 11, 12, 13).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **DENIED**, that the Commissioner's decision be

1

**AFFIRMED,** and that this case be **DISMISSED** and removed from the docket of the Court.

## I.   <u>Procedural History</u>

Gretchen H. Watkins (now Gretchen H. Watkins Bailey) ("Claimant") filed an application for SSI on July 27, 2010, alleging a disability onset date of July 1, 2007, (Tr. at 126), due to obsessive compulsive disorder ("OCD"), bipolar disorder, and learning problems. (Tr. at 151). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 50, 68). Consequently, Claimant filed a request for an administrative hearing, (Tr. at 72), which was held on September 24, 2012 before the Honorable William R. Paxton, Administrative Law Judge ("ALJ"). (Tr. at 27-44). By written decision dated September 28, 2012, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 11-21). The ALJ's decision became the final decision of the Commissioner on October 15, 2013, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

Claimant timely filed the present civil action seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 9, 10). Plaintiff filed a Brief in Support of the Pleadings. Defendant filed a Brief in support of Defendant's Decision, and Plaintiff filed a reply memorandum. (ECF Nos. 11, 12, 13). Therefore, the matter is fully briefed and ready for resolution.

## II.   <u>Claimant's Background</u>

Claimant was 27 years old at the time of her initial application and 29 years old at the time of the ALJ's decision. (Tr. at 11, 126). She left school in the eighth grade due to pregnancy, but can read and write and communicates in English. (Tr. at 17, 20, 36).

Claimant has no past relevant work. (Tr. at 20).

## III.   **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 416.920(b). If the claimant is not engaged in substantial gainful employment, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, under the fourth step the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 416.920(e). After making this determination, the ALJ must ascertain whether the claimant's impairments

prevent the performance of past relevant work. *Id.* § 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. § 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the regulations. *Id.* § 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* § 416.920a(d). A rating of "none" or "mild" in the first three functional areas (limitations on activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes

of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental function. 20 C.F.R. § 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

*Id.* § 416.920a(e)(4).

In this case, the ALJ confirmed at the first step of the sequential evaluation that Claimant had not engaged in substantial gainful activity since July 23, 2010, the application date. (Tr. 13, Finding No. 1). At the second step of the evaluation, the ALJ determined that Claimant had the following severe impairments: "attention deficit hyperactivity disorder (ADHD), generalized anxiety disorder, panic disorder with agoraphobia, obsessive-compulsive disorder (OCD), bipolar disorder, and borderline intellectual functioning." (Tr. at 13-14, Finding No. 2). The ALJ considered Claimant's additional alleged impairment of "back pain," to be non-severe. (*Id.*). Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of

impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 14-15, Finding No. 3). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is limited to understanding, remembering, and carrying out simple instructions; to work without strict production quotas or a rapid pace; to no interaction with the public and only occasional interaction with co-workers and supervisors.

(Tr. at 16-20, Finding No. 4). At the fourth step, the ALJ determined that Claimant had no past relevant work. (Tr. 20, Finding, No. 5). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work-related experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 20-21, Finding Nos. 5-9). The ALJ considered that (1) Claimant was born in 1982, and was defined as a younger individual; (2) she had a marginal education and could communicate in English; and (3) transferability of job skills was not an issue because Claimant did not have any past relevant work. (Tr. at 20, Finding Nos. 6-8). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that exist in significant numbers in the national economy, including work as a stocker, laborer, material handler, warehouse worker, cleaner, laundry worker, assembler, and hand packer. (Tr. at 20-21, Finding No. 9). Therefore, the ALJ concluded that Claimant had not been under a disability, as defined in the Social Security Act, since July 23, 2010, the date on which the application was filed. (Tr. at 21, Finding No. 10).

## IV.  **Claimant's Challenges**

Claimant argues that the Commissioner's decision is not supported by substantial

evidence because (1) The ALJ's rejection of Claimant's IQ scores is not supported by substantial evidence; and (2) the ALJ committed reversible error in finding that Claimant did not meet Listing 12.05C. (ECF No. 11 at 2).

In response, the Commissioner contends that the ALJ properly determined that Claimant's 2010 IQ scores did not establish a finding of mental retardation, and the ALJ provided specific reasons for discounting the IQ scores below 70. (ECF NO. 12, at 13). Furthermore, the Commissioner asserts that Claimant failed to produce any evidence substantiating that she suffered from "significantly subaverage general intellectual functioning with deficits in adaptive functioning" manifesting prior to age 22. (ECF No. 12 at 10-11). Therefore, substantial evidence supports the ALJ's conclusion that Claimant failed to meet Listing 12.05C.

## V.   **Relevant Medical History**

The undersigned has reviewed the transcript of proceedings in its entirety including the medical records in evidence. The following summary, however, is limited to those entries most relevant to the issues in dispute.

### A.  Treatment Records

#### 1. *Jackson General Hospital*

Claimant presented to the Emergency Department at Jackson General Hospital on March 2, 2002, complaining of intermittent flutters in her chest that began two days prior and increased with anxiety; however, she denied chest pain. (Tr. at 361). She reported a great deal of stress at home with her husband. Claimant's past medical history was negative for both psychological symptoms and cardiac symptoms, although she was noted to have undergone heart surgery as a child. (Tr. at 363). Claimant was diagnosed with anxiety, treated with Ativan, and was discharged home in stable

condition. (Tr. at 364). She was prescribed additional Ativan and was told to follow up with Dr. Snyder the following week. (Tr. at 364, 366).

### 2. *Wirt County Health Services*

On April 28, 2008, Claimant presented to her general health care provider, the Wirt County Health Services Association's Community Health Center, and reported having trouble sleeping for the past three weeks, stating that she "lays in bed and thinks about things and then cannot sleep until about 3 a.m." (Tr. at 437). On examination, Claimant's cardiovascular rate and rhythm were regular; her breathing was equal, with full chest expansion on inspiration; and her lung sounds were clear bilaterally on auscultation. Claimant was not noted to be depressed or anxious. Instead, she was alert and oriented, with normal affect; intact recent and remote memory; normal judgment and insight for her age; and clear and coherent speech. (*Id.*). She was prescribed Vistaril 25 mg one at bedtime. The treating provider discussed relaxation techniques and advised Claimant to follow up as required or needed. (*Id.*).

Claimant returned on July 29, 2008 for a cracked tooth in the lower left jaw; however, she requested "something for her nerves too because her mom had open heart surgery, and other things were going on too." (Tr. at 439). Her physical examination was unremarkable. The examining nurse practitioner discussed with Claimant her anxiety issues and the medication, Xanax. (*Id.*). Claimant was counseled that if her tooth pain resolved, she would be able to sleep better, and her anxiety would decrease. Claimant was advised to follow up with the center's physician, Dr. Mullins, if she continued to experience anxiety. (*Id.*).

Claimant's next visit to the Health Center was on June 10, 2010, when she presented without a scheduled appointment. By this time, she had transferred her

primary care to Timothy Crouch, D.O.; however, Dr. Crouch was out of the office, and Claimant needed medication refills. (Tr. at 246). She complained of generalized anxiety disorder, obesity, and back pain. (*Id.*). Claimant's physical examination was normal. She was in no acute distress, although she was noted to be anxious. (Tr. at 247). Claimant was assessed with generalized anxiety disorder and given a prescription for Klonopin. (*Id.*).

### 3.  Timothy Crouch, D.O. (Westbrook Health Services)

On September 4, 2008, Claimant underwent a mental status examination performed by Stacy Dyer, M.A., L.P.C. at Westbrook Health Services. (Tr. at 227). Claimant appeared to be well-groomed; her attitude was cooperative; her affect was appropriate; her speech and motor activity were normal; her memory was fully intact; and her thought process was logical and organized. (*Id.*). Claimant reported no delusions, hallucinations, suicidal or homicidal ideations.  (Tr. at 227-228). Although her insight was noted to be intact, Claimant's judgment was "immature." (Tr. at 228.).

Dr. Crouch completed an initial intake evaluation on September 15, 2008. (Tr. at 224). He recorded that Claimant described symptoms consistent with obsessive compulsive disorder and anxiety, as well as some minor depression. She did not complain of having suicidal or homicidal ideations, and she denied having hallucinations and delusions. (*Id.*). Dr. Crouch conducted a full systems review, without eliciting any other reported problems or symptoms. Accordingly, on Axis I, Dr. Crouch diagnosed Claimant with obsessive compulsive disorder and social phobia.[1] He gave no

---

[1] Many mental health clinicians record diagnoses using the multiaxial evaluation format found in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV"). Under this format, Axis I is clinical disorders; Axis II is personality disorders and mental retardation; Axis III is general medical conditions; Axis IV is psychosocial and environmental problems; and Axis V is a Global Assessment of Functioning score. DSM-IV at 25-31, Americ. Psych. Assoc, 32 (4th Ed. 2002).

diagnosis for Axis II or Axis III, and no GAF score.[2] (*Id.*). Dr. Crouch prescribed Celexa 20 mg, and Klonopin 0.5 mg as needed for anxiety, advising Claimant to return in one month. (*Id.*). Claimant returned as instructed on October 20, 2008 for re-evaluation of her medications. (Tr. at 223). Claimant reported taking Celexa and Klonopin as prescribed but continued to experience episodes of anxiety throughout the day. (*Id.*).

On January 26, 2009, Claimant presented to Dr. Crouch for routine medication refills and evaluation. (Tr. at 222). Claimant reported she was eating and sleeping well and was not overly depressed or anxious. She was not suicidal or homicidal and denied any hallucinations. Dr. Crouch prescribed Celexa 20 mg and Klonopin 0.5 mg and advised Claimant to return in three months. Claimant's diagnosis remained unchanged, and no GAF score was given. (*Id.*).

Claimant failed to appear at her next scheduled appointment on June 10, 2009. (Tr. at 221). However, on June 17, 2009, she returned for routine medication refills. (Tr. at 220). She reported that her medications seemed to be working well, although the Klonopin prescription was not strong enough. (*Id.*). Claimant did not appear overly depressed; did not report any hallucinations or delusions and was not suicidal or homicidal. (*Id.*). Dr. Crouch observed Claimant to be somewhat anxious, and she had trouble focusing. (*Id.*). Claimant's diagnosis remained the same, as did her treatment. (*Id.*). She was advised to return in three months. (*Id.*).

---

[2] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Americ. Psych. Assoc, 32 (4th Ed. 2002) ("DSM-IV"). In the past, this tool was regularly used by mental health professionals; however, in the latest edition of the *Diagnostic and Statistical Manual of Mental Disorders*, DSM-5, the GAF scale was abandoned in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM-5 at p. 16.

Claimant missed another appointment on September 11, 2009, (Tr. at 218), but appeared on September 15, 2009 for a quarterly medication management and medication refill. (Tr. at 217). She reported that she was doing well and was not overly anxious or depressed. (*Id.*). Claimant's diagnosis remained unchanged, and she was continued on Celexa and Klonopin. (*Id.*). By record of the same date, a clinician in the office performed a mental status examination. (Tr. at 225).  Claimant was noted to be well-groomed and cooperative, with normal speech and motor activity. (*Id.*). Her affect was appropriate, and she was fully oriented. Claimant's memory was fully intact;  her thought process was logical and organized; and she did not suffer from delusions. (*Id.*). Claimant's judgment and insight were intact, and she had no suicidal or homicidal ideations. (Tr. at 226).

Claimant next saw Dr. Crouch on January 15, 2010 for routine medication refills. (Tr. at 216). Claimant reported that she was eating and sleeping well. She was not overly depressed, although she was experiencing some break through episodes of panic and anxiety. (*Id.*) Dr. Crouch did not change Claimant's diagnosis, and no GAF score was assigned. Dr. Crouch prescribed Celexa 20 mg to target Claimant's symptoms of Obsessive-Compulsive disorder and social phobia. (*Id.*). Additionally, he prescribed Xanax 1 mg prn for symptoms of anxiety. Claimant was advised to return in three months. (*Id.*).

Claimant returned one month later on February 18, 2010. (Tr. at 215). She reported that there had been a problem with her medication refills several weeks prior that resulted in the cancellation of her Xanax refills. (*Id.*). Dr. Crouch explained to Claimant the nature of a pill count and the importance of having an accurate pill count in order to continue certain medications. (*Id.*). Claimant was having some anxiety as she

11

had been out of medication for several days but was otherwise doing well. (*Id.*). Claimant's diagnosis remained the same, no GAF score was given, and she was again prescribed Celexa 20 mg and Klonopin 1 mg. (*Id.*). Claimant failed to return for her March 10, 2010 pill count. (Tr. at 214). Therefore, Dr. Crouch documented that he would not refill any controlled substances for Claimant. (*Id.*). However, Claimant appeared for the pill count the following day. (Tr. at 213). She indicated that she was doing well on her medications and was not overly anxious or depressed. (*Id.*). Claimant's pill count was correct; therefore, she was prescribed Celexa and Klonopin. Her diagnosis remained unchanged. (*Id.*). Claimant was advised to return in three months and to bring her bottles in at that time for another pill count. (*Id.*). According to the records submitted, this was Dr. Crouch's last contact with Claimant.

### 4.  Mario R. Schwabe, M.D. (Schwabe and Associates)

On November 16, 2010, Claimant presented to Mario R. Schwabe, M.D. for the purpose of a comprehensive psychiatric evaluation and for diagnosis and treatment of her mood swings and anxiety. (Tr. at 260, 301). Claimant reported she had problems with mood swings, anxiety, and symptoms of OCD for the past four years. (Tr. at 260). Her current symptoms ranged from increased energy, racing thoughts, and decreased need for sleep with increased talking, to low energy, low motivation, sadness and anhedonia. She also reported irritability, poor concentration, nervousness and worry with frequent panic attacks. (*Id.*). Claimant described a compulsion to close doors, stating that she could not tolerate being around an open door, and she repeatedly checked the doors in her home to make sure they were locked. Claimant further explained that she constantly checked the bathtub to see if it contained water because of her fear that her children would fall in and drown. (*Id.*). Finally, Claimant stated that

she felt intimidated and judged by other people. Claimant indicated she was unable to get anything done due to her poor concentration and inability to sit still at times. (*Id.*). Dr. Schwabe noted Claimant was neat and clean in appearance with clear speech and relevant thought content. (Tr. at 261). Her memory was intact, and she was oriented times four. Claimant's mood was pleasant; her affect was reactive, and she denied any suicidal or homicidal ideations. (Tr. at 261, 301). Claimant's psychomotor acuity was within normal limits. Dr. Schwabe diagnosed Claimant with ADHD; bipolar disorder NOS; generalized anxiety disorder; and obsessive compulsive disorder along Axis I. Axis II was deferred. Axis III was noted as healthy at this time. Axis IV was listed as psychosocial stressors, moderate. Dr. Schwabe assigned Claimant a GAF score of 70.[3] (*Id.*). Dr. Schwabe discussed various treatment options with Claimant. He ultimately prescribed Adderall XR 30 mg po daily; Zoloft 50 mg po daily; Klonopin 0.5 mg po two times daily as needed, and Neurontin 600 mg po at bedtime. He opined that Claimant's prognosis was good because she was motivated for treatment. (Tr. at 261).

Claimant returned on November 30, 2010 and was seen by Rhoda Mayle, FNP, BC. Claimant was doing better, but appeared "dazed" on Zoloft. She also continued to complain of panic attacks. (Tr. at 299). Claimant's mood was recorded as calm; her affect was pleasant and congruent; her thought content was relevant; thought process and speech were clear; and her association and reality testing were intact. Additionally, Claimant was oriented times four, her judgment and insight were fair, and her psychomotor activity, attention span, and concentration were all within normal limits. (*Id.*). Finally, Claimant's recent and remote memory was noted to be intact; her muscle

---

[3] A GAF of 61-70 indicates the presence of some mild symptoms, but the client is generally functioning pretty well and has some meaningful interpersonal relationships.

strength was symmetrical, and her gait was steady. (Tr. at 300). Claimant's condition was assessed as stable. She was continued on Klonopin, Adderall, and Neurontin, all of which were thought to be helping her. (*Id.*). Claimant asked if Celexa could be added to her regimen, and if Zoloft could be discontinued. Accordingly, these changes were made. (*Id.*).

On January 19, 2011, Claimant was examined by Mary Fauteux, PA-C, and Amanda Thomas, M.A. Claimant reported that the Adderall was wearing off around 2:00 p.m. and she was off Neurontin. (Tr. at 295). She reported her sleep was "pretty good" and her appetite was "normal." There was no change in her social history, although she did comment that she had four kids and was "very busy." (*Id.*). As to her systems review, Claimant's mood was calm, affect pleasant and congruent, and she was oriented times four. (*Id.*). Claimant's thought content was relevant; thought process and speech were clear; judgment and insight both fair; and her association and reality testing were intact. (*Id.*). Claimant's attention span and concentration were reported to be "pretty good til meds wear off." (*Id.*). Claimant's memory was intact. (Tr. at 296). Her diagnosis remained the same, and her GAF score was 76.[4] (Tr. at 295). As for medication, Claimant reported her response to Celexa for depression was good, as was her response to Klonopin for anxiety; however, she noted Adderall for ADHD and Neurontin "wears off." (Tr. at 296). Claimant's condition was assessed as stable, although some changes were made to her medication. Specifically, Neurontin was discontinued, and Adderall 10 mg was added. She was advised to return in one month.

---

[4] A GAF of 71-80 indicates that if symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g. difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g. temporarily falling behind in schoolwork).DSM-IV at 32.

(*Id.*).

Claimant returned on February 16, 2011 and was again seen by Mary Fauteux, PA-C, and Amanda Thomas, M.A. (Tr. at 293). Claimant reported the Adderall 10 mg had helped; she had no new concerns and was "balanced out-happy with the meds." (*Id.*). Once again, there was no change in Claimant's social history. (*Id.*). Upon examination, Claimant's mood was neutral, her affect was appropriate and congruent, and she was oriented times four. (*Id.*). Her thought process and speech were clear, and her psychomotor activity was within normal limits. (*Id.*). Claimant's judgment and insight were deemed fair; her attention span and concentration were good; and her association and reality testing were intact. (*Id.*). She denied suicidal or homicidal ideations; her recent and remote memory was both intact. (Tr. at 293-294). Claimant's diagnosis remained the same. Her GAF score was 74. (Tr. at 293). Claimant was assessed as stable with a good response to her current medications. (Tr. at 294).

On March 16, 2011, Claimant reported she was "doing good," however, she complained the Klonopin was wearing off after four and one-half hours. (Tr. at 359). Claimant reported her sleep and appetite were good. (*Id.*). Her diagnosis remained the same, as did her GAF score. (*Id.*). Claimant's mood was neutral, affect appropriate and congruent, and she was oriented times four. (*Id.*). Her thought process and speech were clear, and her psychomotor activity was within normal limits. (*Id.*). Claimant's judgment and insight were fair; her attention span and concentration good; and her association and reality testing was intact. (*Id.*). Claimant's recent and remote memory was intact. Claimant discussed the Klonopin prescription, indicating that she was scheduled to take a pill in the morning and one in the evening and felt that she needed another one during the day. She was told to try taking the pill only as she needed it, rather than as

scheduled. That way, she might find that the pills stretched further. If not, she could discuss the issue with Mary Fauteux, PA-C, on her next month visit. (Tr. at 360).

On April 13, 2011, Claimant was examined by Mary Fauteux, PA-C. Claimant reported she was "doing pretty good, was happy with her medicines." (Tr. at 357). As to her social history, Claimant reported she had missed a court date, and her husband was granted temporary custody of her children. (*Id.*). Claimant's diagnosis remained the same. Her GAF score was 72. Claimant's mood was noted to be neutral; her affect was appropriate and congruent, though slightly anxious; her thought content was relevant; her thought process and speech clear; her psychomotor activity within normal limits; her judgment and insight were fair; her attention span and concentration good; and her association and reality testing were intact. (*Id.*). Once again, Claimant denied any suicidal or homicidal ideations, and both her recent and remote memory was intact. (Tr. at 357-358). No prescription changes were made at the time. (*Id.*).

Claimant presented on May 10, 2011 and was seen by Mary Fauteux, PA-C, and Amanda Thomas, M.A. Claimant reported all the medications were working well. She was happy with the treatment and had no new complaints. (Tr. at 355). Her diagnosis and GAF score were the same, as was her mental status evaluation. (*Id.*). Claimant was felt to be stable and with a good response to all current medications. Consequently, no changes were made to her medication regiment. (*Id.*).

Claimant continued to treat with Schwabe and Associates, and on June 7, 2011, she reported she was "pretty good, busy with four kids and happy with medications." (Tr. at 353). Her diagnosis and GAF remained the same. (*Id.*). An examination revealed her mood was calm, affect pleasant and congruent, and her psychomotor activity was within normal limits. Claimant's thought process and speech were clear; her judgment

16

and insight fair, and her association and reality testing were intact. (*Id.*). Claimant's attention span and concentration were described as "pretty good," both recent and remote memory was intact, and her gait was steady. (Tr. at 353-354). Claimant's medication regimen was noted to be helpful, and she was assessed as stable. (Tr. at 354).

On July 5, 2011, Claimant was examined by Mary Fauteux, PA-C, and reported she was doing well, had no new concerns, and was happy with her medication. (Tr. at 351). Her sleep and appetite were good, and she continued to be very busy with four children. (*Id.*). Claimant's diagnosis remained the same, and she was assigned a GAF score of 74. (*Id.*). Upon examination, Claimant's mood was calm; affect pleasant and congruent; thought content was relevant; and thought process and speech were clear. (*Id.*). Her psychomotor activity was within normal limits; judgment and insight fair; and her association and reality testing was intact. Claimant's attention span and concentration were both described as "pretty good." (*Id.*). Claimant's response to all medication was good, and no changes were made at this visit. (Tr. at 352). Claimant was assessed as stable. (*Id.*).

At her August 2, 2011, office visit with Ms. Fauteux and Ms. Thomas, Claimant reported that Klonopin had become less effective over time, although her other medications were still satisfactory. (Tr. at 349). Claimant's sleep was "fair" and her appetite "alright." (*Id.*). Her diagnosis and GAF score were the same. (*Id.*). Claimant's mood was calm; her affect smiling; thought content was relevant; and her thought process and speech were clear. (*Id.*). Once again, Claimant's judgment and insight were fair and her association and reality testing intact. (*Id.*) Claimant's attention span and concentration were documented to be "perfect." (*Id.*). Claimant's recent and remote memory was both intact and her gait steady. (Tr. at 350). Claimant was kept on the

same medication regimen as it was noted to be helpful. (*Id.*). She was assessed to be stable and told to return in one month. (*Id.*).

Claimant returned on August 30, 2011 and reported that she had been doubling up on Klonopin and "it helps a lot." (Tr. at 348). Claimant was given a GAF score of 72. Her affect was congruent; her thought process and speech clear; and her psychomotor activity within normal limits. (*Id.*). Claimant's judgment and insight were also noted to be fair, and her association and reality testing were intact. Her attention span and concentration were within normal limits. (*Id.*). Claimant's condition remained stable on this visit and on the rest of the visits in 2011. (Tr. at 340-346). She was continued on the same medication regimen, with the same diagnoses and same GAF score. (*Id.*).

Claimant's first appointment in 2012 was on January 24, 2012. (Tr. at 336). On this visit, she reported doing well and being happy with her medications, with the exception that she ran out of Adderall a week earlier and "could not focus on anything." (*Id.*). Claimant did complain of being "moody," but her sleep and appetite was good. (*Id.*). Claimant's examination revealed a calm mood, pleasant and congruent affect, and relevant thought content. Although her thought process and speech were clear, they were noted to be pressured and interrupting. (*Id.*). Claimant's judgment and insight were noted to be fair, but her attention span and concentration was described as "poor without meds." (*Id.*). Claimant's diagnoses remained unchanged; however, her GAF score was 68. (*Id.*). The decision was made to wean Claimant off Celexa and resume Neurontin 300 mg. She remained on Adderall and Klonopin, which continued to work well for her. (Tr. at 337).

On February 21, 2012, Claimant was seen by Ms. Fauteux and reported that her medications were working "really well." (Tr. at 334). Her sleep and appetite were

described as good. Claimant's diagnoses included ADHD; bipolar disorder, and generalized anxiety disorder; however, OCD was no longer listed. (*Id.*). Claimant's GAF score was 70. Her mood was calm, affect pleasant and congruent and her thought content relevant. (*Id.*). Claimant's judgment and insight were fair, and her attention span and concentration noted to be "pretty good." (*Id.*). Claimant's medication regiment continued to be helpful and she remained stable. (Tr. at 335).

Claimant was examined by Ms. Fauteux on March 20, 2012, and once again reported that she was doing well, was happy with her medications, and had no new concerns. (Tr. at 332). Her diagnoses included ADHD; bipolar disorder, and generalized anxiety disorder with a GAF score of 72. (*Id.*). Her systems review continued to remain unchanged and it was noted her attention span and concentration were "really good with medication." (*Id.*). Claimant was essentially the same on follow-up in April, May, June, and July 2012. (Tr. at 324-331).

### B. Evaluations and Opinions

On October 27, 2010, William C. Steinhoff, M.A., performed an Adult Mental Profile for the West Virginia Disability Determination Service. (Tr. at 252-258). Claimant reported she was recently married and her last name was now Bailey. (Tr. at 252). She was observed to be cooperative, but restless throughout the interview. (*Id.*). Claimant reported she had panic attacks, OCD, and bipolar disorder. (Tr. at 253). She indicated that the panic attacks started when she was in school, but were not diagnosed until five years ago. Claimant described having difficulty being around others, being nervous around them, and constantly worrying about her husband. (*Id.*). She also reported problems with sleeping, stating that she sometimes had racing thoughts and got up several times during the night to check the door locks. (*Id.*). Additionally, she

complained of crying spells and periods of decreased need for sleep, with increased energy, during which she could "clean really good." (*Id.*). Claimant reported these manic periods occurred approximately two times a month, although her energy level recently had been "normal." (*Id.*). Claimant also reported feelings of depression for the past year and brief periods of hypomania during that time; but the depression was predominant. (*Id.*). Claimant described a history of suicidal thoughts and episodes of her heart beating fast and feeling that she could not catch her breath. (*Id.*). Claimant stated that she was not receiving outpatient mental health treatment at that time and had no history of inpatient mental health treatment. (Tr. at 254). She did indicate that she had received outpatient mental health care in Westbrook Center and by Dr. Crouch, but not recently. According to Claimant, she received mental health treatment primarily from her family physician. (*Id.*).

As for her educational history, Claimant reported she did not do well in school and could not read well. (*Id.*). She indicated that she had been in special education/learning disability classes. Claimant completed seventh grade, but quit in eighth grade due to pregnancy. (*Id.*). She obtained a valid driver's license by taking the examination orally after failing it six times. She had since allowed her license to expire and did not drive. (*Id.*).

Mr. Steinhoff noted Claimant's eye contact was fair. She appeared depressed and tearful most of the evaluation. (Tr. at 255). Claimant's speech was clear and coherent, though, and sometimes relevant, and she was oriented in all spheres. (*Id.*). Her mood was depressed; affect labile; thought process clear and coherent, and her thought content contained no bizarre thoughts, although Claimant reported social phobias like checking doors, having to call her husband, and panic attacks when around people in

public places. (*Id.*). Claimant's insight was fair; her judgment appeared at least mildly limited; her immediate memory and remote memory both within normal limits. (*Id.*). Claimant's concentration was at least mildly impaired; her abstract reasoning moderately limited; and her psychomotor behavior revealed restlessness. (*Id.*). Mr. Steinhoff observed that Claimant shook her leg throughout the evaluation.  Her general fund of knowledge appeared moderately limited; and she obtained a scaled score of 6 on the Information test. (*Id.*). Claimant's pace was deemed to be mildly slow, and her persistence was moderately impaired based on her interaction during the evaluation. (Tr. at 255-256). Claimant's social functioning was moderately impaired secondary to anxiety, depression, and labile affect. (Tr. at 256).

On the Wechsler Adult Intelligence Scale (WAIS-IV), Claimant scored 76, 67, 66, and 76 for verbal comprehension, perceptual reasoning, working memory, and processing speed, respectively, while her full scale IQ was assessed at 66. (*Id.*). Claimant's Wechsler Fundamentals Academic Scales results reflected word reading, spelling, and arithmetic skills corresponding to grade levels of 4th, 2nd, and 2nd, respectively. (Tr. at 257). Mr. Steinhoff noted that while Claimant's Full Scale IQ of 66 suggested intellectual abilities within the range of mild mental retardation, he believed that based upon her interaction at this evaluation and reported educational and vocational background, her intellectual abilities were estimated to fall within the borderline range. (*Id).* Claimant's scores on the WRAT-3 appeared to be a valid measure of her academic skills. (*Id.*). Mr. Steinhoff noted that tearfulness, depressed mood, and distractibility did not appear to be a significant problem while Claimant was taking the WRAT-3, and she did attempt all items presented, including items she was uncertain. (*Id.*).

Mr. Steinhoff diagnosed Claimant with bipolar II disorder, depressed; panic disorder with agoraphobia; and obsessive-compulsive disorder on Axis I; and borderline intellectual functioning on Axis II. (*Id.*). He felt Claimant's prognosis was guarded and, if awarded benefits, Claimant would not have adequate cognitive ability to manage her finances as a result of her poorly developed academic skills. (Tr. at 258).

On December 1, 2010, Jeff Boggess, Ph.D completed a Psychiatric Review Technique. (Tr. at 267-280). Dr. Boggess found that a RFC Assessment would be necessary and the categories upon which the medical disposition were based included organic mental disorders; affective disorders; and anxiety-related disorders. (Tr. at 267). Dr. Boggess indicated the need to rule out borderline intellectual functioning as a medically determinable impairment. (Tr. at 268). Additionally, as to affective disorder, Dr. Boggess found the condition of bipolar disorder to be a medically determinable impairment that was present but did not precisely meet the diagnostic criteria. (Tr. at 270). Similarly, Dr. Boggess listed panic disorder/OCD as a medically determinable impairment that was present but did not precisely satisfy the diagnostic criteria for anxiety-related disorders. (Tr. at 272). As to Claimant's functional limitations, Dr. Boggess found mild restriction of activities of daily living; moderate limitation as to difficulties maintaining social function, as well as difficulties maintaining concentration, persistence and pace, and no episodes of decompensation. (Tr. at 277). He felt the evidence did not establish the presence of the paragraph "C" criteria. (Tr. at 278-279). He opined the IQ scores obtained by Mr. Steinhoff were questionable as Claimant was emotionally upset during testing. As to the diagnosis of bipolar disorder; panic disorder; OCD and borderline intellectual functioning, Dr. Boggess reported that these were based solely on Claimant's self-report as there was no treatment history or school records to

corroborate them. (*Id.*). He opined without school records and psychiatric treatment history, Claimant's current allegations appeared less credible. (*Id.*).

By report of same date, Dr. Boggess completed a Mental Residual Functional Capacity Assessment. (Tr. at 263-266). As to understanding and memory, he found Claimant was not significantly limited in ability to remember locations and work-like procedures, understand and remember very short and simple instructions. (Tr. at 363). He did find Claimant was moderately limited in her ability to understand and remember detailed instructions. (*Id.*). As to sustained concentration and persistence, Claimant was not significantly limited in the ability to carry out very short and simple instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them and make simple work-related decisions and the ability to complete a normal work day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 263-264). Claimant did, however, have moderately limited ability to carry out detailed instructions. (Tr. at 263). As for social interaction, Dr. Boggess found that Claimant was not significantly limited in her ability to ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors and maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (Tr. at 264). Claimant was moderately limited in her ability to interact appropriately with the general public and get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (*Id.*). Finally, Claimant was not significantly limited in

any area of adaption, which included the ability to respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation and set realistic goals or make plans independently of others. (*Id.*). In his review, Dr. Boggess noted that Claimant cared for herself and her children; prepared daily meals; performed household chores; went outside 1-2 times every five days; did not drive due to anxiety; shopped once a month; could count change; watched television; talked on the telephone with family; and spent time with her sister and children. (Tr. at 265). Consequently, Dr. Boggess opined that Claimant retained the ability for 1-2 step work activity with limited contact with the general public. (*Id.*).

On May 2, 2011, Philip E. Comer, Ph.D, completed a Psychiatric Review Technique finding the categories upon which the medical disposition were based to be organic mental disorders; affective disorders; anxiety-related disorders; and personality disorders. (Tr. at 309-322). Dr. Comer recorded ADHD-CT as to organic mental disorders; bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (currently characterized by either or both syndromes) as to affective disorders; anxiety as the predominant disturbance or anxiety experienced in the attempt to master symptoms as evidenced by generalized persistent anxiety accompanied by motor tension, or autonomic hyperactivity, or apprehensive expectation as to anxiety related disorders. (Tr. at 310, 312, 314). As to personality disorders, Dr. Comer listed O/C PD. (Tr. at 316). Claimant's degree of limitation was felt to be mild in restriction of activities of daily living and moderate as to difficulties in maintaining social function and maintaining concentration, persistence and pace with one or two episodes of decompensation. (Tr. at

24

319).  Dr. Comer felt the evidence did not establish the paragraph "C" criteria. (Tr. at 320). He noted the February 16, 2011 progress note of Schwabe and Associates that indicated Adderall 10 mg had helped, and there were no new concerns with Claimant reporting "I am balanced out," happy with medications, and her mood was neutral, affect appropriate and oriented times four. (Tr. at 321).

By report of same date, Dr. Comer completed a Mental Residual Functional Capacity Assessment. (Tr. 305-308). He concluded that Claimant was not significantly limited in her ability to remember locations and work-like procedures and understand and remember very short and simple instructions; however, she was moderately limited in her ability to understand and remember detailed instructions. (Tr. at 305). As to sustained concentration and persistence categories, Dr. Comer noted Claimant was not significantly limited in her ability to carry out very short and simple instructions; maintain attention and concentration for extended periods; sustain an ordinary routine without special supervision; make simple work-related decisions and complete a normal work day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. at 305-306). Claimant was however, moderately limited in her ability to carry out detailed instructions; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; and work in coordination with or proximity to others without being distracted by them. (Tr. at 305). With regard to social interaction, Claimant was found not significantly limited in her ability to ask simple questions or request assistance; get along with co-workers or peers without distracting them or exhibiting behavioral extremes and maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (Tr. at 306).

Claimant was moderately limited in her ability to interact appropriately with the general public and  accept instructions and respond appropriately to criticism from supervisors. (*Id.*). As to adaptation, Claimant was not significantly limited in her ability to be aware of hazards and take appropriate precautions; travel to unfamiliar places or use public transportation and set realistic goal or make plans independently of others. (*Id.*). Claimant was found moderately limited in her ability to respond appropriately to changes in the work setting. (*Id.*). As to her functional capacity assessment, Dr. Comer opined Claimant's statements regarding severity of psychological limitations were not fully supported by the most recent examination, and partial credibility was suggested. (Tr. at 307). Dr. Comer found Claimant appeared to have the mental and emotional capacity for simple, routine work-like activity in a work environment that has minimal social interaction requirements and that can accommodate some mood lability and her physical limitations. (*Id.*).

On September 20, 2012, Claimant's primary medical provider, Mary Fauteux, PA-C, completed a Mental Assessment of Ability to do Work-Related Activities. (Tr. at 446-448). Ms. Fauteux opined that Claimant had limitations in multiple functional areas and in varying degrees, including the following: slight limitation in her ability to function independently; slight to moderate limitation in using judgment; moderate limitation in following work rules; moderate to marked limitation in relating to co-workers and interacting with supervisors;  marked to extreme limitation in dealing with the public, maintaining attention and concentration; and extreme limitation in dealing with work stresses. (Tr. at 447). To support these findings; Ms. Fauteux concluded Claimant suffered from significant social anxiety and frequent panic attacks. (*Id.*). As to Claimant's abilities in making performance adjustments, Ms. Fauteux reported

Claimant's ability to understand, remember and carry out complex job instructions was slightly limited; to understand, remember and carry out detailed, but not complex job instructions was moderately limited; and to understand, remember and carry out simple job instructions was markedly limited. (*Id.*). As for Claimant's abilities in making personal social adjustments, Ms. Fauteux reported Claimant's ability to maintain personal appearance was slightly to moderately limited, and her ability to behave in an emotionally stable manner and relate predictably in social situations was moderately to markedly limited. (Tr. at 448.). Additionally, Claimant's ability to complete a normal work day and work week without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods was markedly to extremely limited. (*Id.*). To support her findings, Ms. Fauteux opined that "despite medication which helps with anxiety, I do not feel patient is capable of being employed at this time." (*Id.*)

## VI.   **Standard of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is

adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII.  <u>Discussion</u>

Both of Claimant's challenges involve the ALJ's determination that Claimant's impairments fail to meet or equal Listing 12.05C. A claimant should be found disabled at the third step of the sequential evaluation process when his or her impairments meet or medically equal an impairment included in the Listing. The Listing describes "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *See* 20 C.F.R. § 416.925. Because the Listing is intended to identify those individuals whose mental or physical impairments are so severe that they would likely be found disabled regardless of their vocational background, the SSA intentionally set the criteria defining the listed impairments at a higher level of severity than that required to meet the statutory definition of disability. *Sullivan v. Zebley,* 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). However, "[f]or a claimant to show that his impairment matches a [listed impairment], it must

meet *all* of the specified medical criteria." *Id.* at 530. The claimant bears the burden of production and proof at this step of the disability determination process. *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983).

Section 12.00 of the Listing pertains to Mental Disorders, which are arranged in nine diagnostic categories, including listing 12.05 (Mental Retardation[5]). 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00. According to the regulations:

> The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If [a claimant's] impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, [the SSA] will find that [the] impairment meets the listing.

*Id.* In other words, to qualify for disability under listing 12.05C, Claimant must establish that she has an intellectual impairment that satisfies both the *diagnostic description* of mental retardation and the *severity criteria* set forth in paragraph C. The diagnostic description of mental retardation, sometimes called the first prong of the listing, is "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.05. The severity criteria of paragraph C, which constitute the next two prongs of the listing, include: "a valid verbal, performance, or full scale IQ of 60 through 70" **and** "a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.*

---

[5] The term "mental retardation" was replaced with "intellectual disability" effective September 3, 2013. 78 Fed.Reg. 46,499–46,501 (Aug. 1, 2013). However, this change "does not affect the actual medical definition of the disorder or available programs or service," *Id.* at 46,500. Moreover, the structure of the listing, its diagnostic description, and its severity criteria are unchanged.

In this case, the ALJ found that Claimant did not meet or equal Listing 12.05C for two reasons. First, she did not have valid IQ proof of subaverage general intellectual functioning in the 60-70 range, and second, she did not provide evidence of deficits in adaptive functioning that manifested prior to age 22. The ALJ explained as follows:

> Finally, the "paragraph C" criteria of listing 12.05 are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60-70 with a significant sub average general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period (prior to attainment of age 22) and a physical or other mental impairment imposing an additional and significant work-related limitation of function. On October 27, 2010, the claimant presented for a consultative evaluation with William Steinhoff, M.A., and reported that she completed the seventh grade in school and was in special education. Mr. Steinhoff administered the Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV) test, which evidenced a verbal comprehension score of 76, a perceptual reasoning score of 67, working memory score of 66, processing speed score of 76, and a full-scale IQ score of 66. Mr. Steinhoff assessed a diagnosis of borderline intellectual functioning noting that she put forth a good effort during testing but had difficulty staying focused. His assessment did not indicate whether testing was valid, but instead pointed out that there were no prior psychological testing records available. While the record demonstrates that the claimant was tested and received IQ scores falling in the range of 60 to 70; there is no evidence of validity or comparative IQ scores during the developmental period. There are no records demonstrating deficits in adaptive functioning prior to attainment of age 22 (Exhibit 3F). The undersigned finds that the claimant's records fail to satisfy the "paragraph C" criteria.

(Tr. at 15). In the introduction to Section 12.00, the SSA explains that "[s]tandardized intelligence test results are essential to the adjudication of all cases of intellectual disability that are not covered under the provisions of 12.05A." 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00. However, "since the results of intelligence tests are only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation." *Id.* Furthermore, when

"considering the validity of a test result, [the ALJ] should note and resolve any discrepancies between formal test results and the individual's customary behavior and daily activities." *Id.* In general, the results obtained by a licensed psychologist following administration of accepted intelligence tests are entitled to considerable weight in Social Security cases, but the ALJ is not required to accept such scores. *See Clark v. Apfel,* 141 F.3d 1253, 1255 (8th Cir. 1998); *see also Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 1996); *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1988); *Foster v. Heckler,* 780 F.2d 1125, 1130 (4th Cir. 1986). The ALJ may reject IQ scores if they are inconsistent with other substantial evidence in the record, such as conflicting professional opinions, or other evidence indicating that the claimant historically achieved higher scores or has more advanced functional capacities than would be expected from someone with a below-average IQ. *Clark*, 141 F.3d at 1255; *see also Hancock v. Astrue*, 667 F.3d 470, 474 (4th Cir. 2012) ("[A]n ALJ has the discretion to assess the validity of an IQ test result and is not required to accept it even if it is the only such result in the record."). Indeed, IQ test results must be examined "to assure consistency with daily activities and behavior." *Popp v. Heckler,* 779 F.2d 1497, 1499 (11th Cir. 1986). The question is "whether the decision to disregard the scores as unreliable is supported by substantial evidence from the record as a whole." *Pogue v. Astrue,* 692 F. Supp.2d. 1088 (E.D. Mo. 2010).

According to Claimant, the ALJ erred by "rejecting" without a valid reason Claimant's Full Scale IQ score of 66, which met the severity range of the second prong of Listing 12.05C. Claimant argues that while an ALJ may disregard an IQ score that is inconsistent with other evidence in the record, he may not refuse to accept an otherwise valid score simply because it is the only score in the record. She adds that all

of the justifications provided in the Commissioner's brief for finding the IQ score invalid are nothing more than *post hac* rationalizations of a barebones decision by the ALJ that was based upon improper factual findings.

Claimant's argument is unpersuasive, however, because her reading of the written decision is simply mistaken. The ALJ did not reject Mr. Steinhoff's valid IQ score without a reason. Instead, the ALJ merely accepted Mr. Steinhoff's opinion that the score underrepresented Claimant's intellectual capacity, and Claimant offered no other IQ evidence. Moreover, Claimant's criticism of the ALJ's discussion surrounding Listing 12.05C is misguided. Claimant implies that the discussion is inadequate; however, she ignores Mr. Steinhoff's narrative report accompanying the IQ scores, which provides the contextual foundation of the ALJ's discussion. Under the section of his report entitled "WAIS-III [sic] Validity," Mr. Steinhoff writes: "On the WAIS-IV, the claimant obtained a Full Scale IQ score of 66, suggesting intellectual abilities fall within the range of mild mental retardation." (Tr. at 257). Accordingly, Mr. Steinhoff recognized that the score, by itself, was consistent with an Axis II diagnosis of mental retardation. Along that line, he went on to note that Claimant provided some history consistent with the diagnosis in that she reported being in special education classes, although no records were available to substantiate a prior diagnosis of mental retardation. Despite this history, Mr. Steinhoff nonetheless opined that "[b]ased on her interaction throughout the evaluation, as well as reported educational and vocational background, the claimant's intellectual abilities are estimated to fall within the borderline range." (*Id.*). Given that "borderline intellectual functioning"[6] is defined as

---

[6]DSM-IV at 684.

an IQ in the 71-84 range, by conferring this explicit diagnosis at Axis II, (*Id.*), Mr. Steinhoff implicitly discounted the accuracy of the IQ score he obtained. He then provided a reasonable explanation for the discrepancy between Claimant's score and his diagnosis of borderline intellectual functioning, indicating that Claimant was tearful, depressed, restless, and had difficulty staying focused when she took the IQ test. (*Id.*). Therefore, the ALJ correctly understood the narrative report when he determined that the IQ score obtained by Mr. Steinhoff did not meet Listing 12.05C. Claimant produced no other records showing IQ scores in the requisite range of 60-70. Thus, as the ALJ emphasized, in the absence of other qualifying IQ scores, and in the face of Mr. Steinhoff's narrative report, which failed to confirm the validity of the IQ scores submitted, Claimant could not meet her burden of proof on the second prong of Listing 12.05C.

To the extent that Claimant's challenge is in fact directed at what she perceives to be contradictions in the written decision, she need look no further than the findings and diagnoses set forth in Mr. Steinhoff's report to see that her criticism against the ALJ is misplaced. The inconsistent factual findings she alleges were made by the ALJ in support of his step three determination, (*e.g.* that Claimant had difficulty staying focused during her IQ test but "distractibility did not appear to be a significant problem" with achievement testing), were nothing more than accurate restatements of Mr. Steinhoff's observations/assessments. The Court does not re-weigh conflicting evidence, determine the credibility of an expert's opinions, or substitute its judgment for that of the ALJ. *Hays*, 907 F.2d at 1456. The ALJ determined that Claimant had borderline intellectual functioning based upon Mr. Steinhoff's testing and diagnosis, and that finding is both supported by and consistent with other substantial evidence in

the record. Also probative of the issue is the lack of any evidence establishing that Claimant has a history of subaverage general intellectual functioning. Therefore, the undersigned **FINDS** that the ALJ did not err when he concluded that Claimant did not have the requisite IQ score to meet the second prong of Listing 12.05C.

As previously stated, in order to meet or equal a listed impairment, the claimant must fulfill all of the listing's requirements. Thus, Claimant's failure to produce a valid IQ score in the 60-70 range is fatal to her complaint. Nevertheless, the undersigned will address Claimant's second challenge. Claimant contends that the ALJ also erred when he found that Claimant had no evidence of deficits in adaptive functioning manifesting prior to age 22. Intrinsic to the diagnostic description of mental retardation is evidence of early-onset (pre-age 22) deficits in adaptive functioning. Adaptive functioning "refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." DSM–IV–TR[7] at 40. Skill areas of adaptive functioning include "communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Id.* at 39. To determine whether a claimant demonstrates deficits in adaptive functioning that manifested during the developmental period, the ALJ must perform a fact-specific inquiry. Although this inquiry has "few bright line rules," courts in this

---

[7] Diagnostic and Statistical Manual of Mental Disorders, American Psychiatric Association, 4th ed., Text Revision, 2000 ("DSM–IV–TR"). The SSA recognizes four major professional organizations that each has its own definition of mental retardation. All four definitions include significant deficits in adaptive functioning as an element of the condition although the organizations differ in the required date of onset and the method of measurement. *See* Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed.Reg. 20,018–01, at 20,022 (Apr. 24, 2002). The American Psychiatric Association's definition, while not specifically adopted by the SSA, is generally accepted and recognized in the field of mental health.

circuit have pointed to multiple factors that tend to establish the presence of deficits in adaptive functioning with an early onset. *See Weedon v. Astrue,* Case No. 0:11–2971–DCN–PJG 2013 WL 1315311, at *5 (D.S.C. Jan. 31, 2013) (collecting cases). For example, if a claimant has previously been diagnosed with mental retardation, courts are inclined to find that the claimant had an earlier onset of deficits in adaptive functioning. *Conyers v. Astrue,* No. 4:11–CV–00037–D, 2012 WL 3282329, at *8-9 (E.D.N.C. June 29, 2012). In addition, evidence of a claimant's illiteracy, *Rivers v. Astrue,* No. 8:10–cv–314–RMG, 2011 WL 2581447, at *4 (D.S.C. June 28, 2011); evidence that a claimant has never lived independently, *Holtsclaw v. Astrue,* No. 1:10CV199, 2011 WL 6935499, at *5 (W.D.N.C.Dec.30, 2011); and evidence that a claimant is dependent on others, or has never been responsible to care for others, *Salmons v. Astrue,* No. 5:10-CV-195–RLV, 2012 WL 1884485, at *7 (W.D.N.C. May 23, 2012), have all been considered proof of deficits in adaptive functioning that manifested before age 22.

Another well-recognized indicator of limitations in adaptive functioning manifesting in the developmental years is poor academic performance. *Smith v. Astrue,* 2011 WL 846833, at *3 (D.S.C. Mar. 7, 2011); *Salmons v. Astrue,* 5:10-cv-195-RLV, 2012 WL 1884485, at *7 (W.D.N.C. May 23. 2012) ("[F]unctional academic skill is the primary measure of deficits in adaptive functioning before age 22.") Accordingly, school records showing ongoing problems in the classroom are important evidence of early-onset deficiencies in functioning that should not be undervalued when assessing the diagnostic description of mental retardation. Work history is also a factor to consider, as absent or unstable job performance may indicate deficits in adaptive functioning; although, the existence of a stable work history, by itself, is not

35

determinative of the inquiry. *See Salmons,* 2012 WL 1884485, at *2-3 (citing *Luckey v. U.S. Dep't of Health & Human Servs.,* 890 F.2d 666, 669 (4th Cir. 1989)).

Here, the ALJ was careful to point out that Claimant's "records" failed to establish the presence of deficits in adaptive functioning manifesting in the developmental period. (Tr. at 15). In other words, rather than finding that Claimant did not have such deficits, the ALJ found that Claimant lacked evidence of them. Claimant reported receiving special education, but no documentation corroborated her statements. Indeed, Claimant failed to produce any school records. She left school in the eighth grade, but admitted that this was due to pregnancy rather than lack of ability. Furthermore, Claimant did not initiate regular psychological treatment until she was approximately twenty-six years old. Of particular note, her mental health records consistently reflect "no diagnosis" or a "deferred" diagnosis at Axis II, indicating that none of Claimant's treating mental health providers suspected or found Claimant to have the deficits in adaptive functioning and subaverage general intellectual functioning that are the hallmarks of mental retardation. (Tr. at 213-217, 220-224, 261, 292-301, 324-359). The ALJ also noted that once Claimant began treating with Schwabe & Associates in 2010, her condition and mental status examinations improved significantly and stabilized with medication. (Tr. at 18). He stated that Claimant was repeatedly described as appearing calm, pleasant, clear, and relevant with good psychomotor activity, attention and concentration. The ALJ remarked on Claimant's GAF scores, which ranged from 68 to 76 over an almost two-year period, demonstrating only mild to slight impairment in social, occupational, and school functioning, yet Claimant's IQ was not tested during a period of stabilization.

Claimant has the burden of producing evidence and proving that she meets or

equals every aspect of Listing 12.05C. The only evidence she provided of early-onset deficits in adaptive functioning were her own statements, and the ALJ found Claimant to be less than credible. In contrast, the ALJ thoroughly reviewed and discussed other substantial evidence in the record that tended to disprove Claimant's allegation of mental retardation. Consequently, the undersigned **FINDS** that the ALJ did not err in finding that Claimant failed to carry her burden to demonstrate the presence of deficits in adaptive functioning that manifested prior to age 22.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **DENY** Plaintiff's Motion for Judgment on the Pleading, (ECF No. 11), **AFFIRM** the decision of the Commissioner (ECF No. 12), **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Johnston and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**:  January 5, 2015.

Cheryl A. Eifert
United States Magistrate Judge